[Civ. No. 4576. Third Appellate District.—October 28, 1932.]

VAN COURT WARREN, Plaintiff and Appellant, v. E. MARJORIE WARREN, Defendant and Appellant.

John Perry Wood for Plaintiff and Appellant.

Louis G. Campbell, John W. Maltman, Alberta Belford and Harold S. Morrison for Defendant and Appellant.

PLUMMER, J.—The defendant appeals from the judgment of the Superior Court of Los Angeles County granting the plaintiff a divorce and awarding him the custody of two minor children. The plaintiff appeals from that portion of the judgment which permits the defendant to have the custody of said minor children for four weeks during the summer vacation period.

Two questions only are really presented upon this appeal for our consideration: First, the validity of divorce proceedings instituted by the defendant in the state of Nevada. Second, the fitness of the defendant to have the custody and control of the two minor children, the issue of the marriage between plaintiff and defendant. The two minor children are at the present time named and aged as follows: Jean Marjorie Fay Warren, over the age of eleven years, and George Cameron Warren, over the age of eight years.

The record shows that the plaintiff and defendant had, for a number of years been residents of the county of Los Angeles in the state of California; that the marital domicile had at all times been in the county of Los Angeles; that the defendant began a suit against the plaintiff to obtain a decree of divorce in the county of Los Angeles and thereafter dismissed the action, went to Reno, filed a complaint praying for a divorce in the District Court of the State of Nevada at Reno; that substituted service only was made of the summons in said action; that the plaintiff in this action

never appeared therein; that the children of the marriage were not in the state of Nevada during the court proceedings there taken and had.

The findings of the trial court relating to the action for divorce prosecuted by the defendant in the state of Nevada are as follows:

"From the time of said marriage until the commencement of this action plaintiff was a resident of the City of Los Angeles, county of Los Angeles, State of California. Except for temporary visits to other places, and except during a separation of the parties for less than two months in the months of May and June, 1926, plaintiff and defendant resided together in said city of Los Angeles. The matrimonial domicile of the parties from the date of said marriage until their said separation on November 15, 1926, was in said city of Los Angeles. During said separation in May and June, 1926, both of said parties resided in said city of Los Angeles. On November 15, 1926, defendant instituted in this court an action for divorce against plaintiff. In the complaint in such action she alleged her residence to be at Los Angeles, California. In said city she continued to live until June 22, 1927. On June 22, 1927, defendant dismissed her said action begun as aforesaid on November 15, 1926, and journeyed to the city of Reno, State of Nevada. To such city, and without the knowledge and against the will of plaintiff, defendant took with her the minor children of the parties. Shortly before such departure for Reno, defendant caused to be issued to her a United States passport for herself and said minor children to England and Austria. Her application for such passport was filed April 4, 1927. Therein under oath, defendant alleged her residence to be in said city of Los Angeles. Defendant remained in said city of Reno, except for trips made to San Francisco, or Los Angeles, and to New York, until about March 1, 1928. On or about said date she returned to the State of California. Defendant did not go to the State of Nevada and did not remain in the State of Nevada for the purpose of there establishing her domicile or for the purpose of making said State her place of residence, but only for the purpose of commencing an action in said state against the plaintiff for a divorce and securing a judgment therein. Defendant did not intend when she went to said State of Nevada, and has not since

intended to remain in the State of Nevada except for the time necessary to procure such decree of divorce. Neither the domicile nor the legal residence of defendant has at any time in the year 1927 or in the year 1928 been in the State of Nevada. Defendant during all of the year 1927 and during the year 1928 until the trial of this action has been a legal resident of and a citizen of the county of Los Angeles, State of California.

. . . . . . . . . . . .

"On November 11, 1927, said defendant instituted against the plaintiff herein, in the Second Judicial District Court of the State of Nevada, in and for the county of Washoe, an action for divorce in said court numbered 25226. On the 28th day of February, 1928, was signed, and on the 12th day of March, 1928, was filed and entered in said court a judgment purporting to dissolve the bonds of matrimony between plaintiff and defendant, to grant to E. Marjorie Warren a decree of divorce, and to award to her the custody of said minor children of the parties. Said judgment is in the form and words of the exhibit attached to the answer of defendant herein.

"Neither upon the day when said action was instituted in said court in the State of Nevada, nor at any time thereafter were said minor children in the State of Nevada, or within the jurisdiction of said court of the State of Nevada. Said children during all of said time were in the custody and care of the plaintiff herein. Plaintiff, Van Court Warren, was not at any time personally served with summons or other process in said action instituted in the State of Nevada. Said plaintiff did not at any time appear in said action and has not at any time submitted himself to the jurisdiction of the court wherein said action was instituted. Summons in said action was published in the State of Nevada. Said court of the State of Nevada did not at any time acquire jurisdiction of the marital status of the plaintiff and defendant or jurisdiction over the plaintiff herein, nor over said minor children or their custody, nor to make or enter the judgment signed and filed in said court as aforesaid. Said judgment is not entitled to any faith or credit, but is invalid and of none effect, and is not binding upon this court."

Upon the question of the fitness of the defendant to have the care, custody and control of the two mentioned minor children, the trial court found as follows:

"Defendant in her relations with her husband has been untrustworthy and untruthful and has failed to keep various promises made by her. On or about April, 1925, in the course of an operation performed upon her, she unnecessarily, against the will, and without the knowledge of her husband, but to please another man and render safe her improper relations with him, caused herself to be made sterile and barren.

"During a period of several years prior to the separation of plaintiff and defendant, defendant sustained adulterous relations with one James Scripps Booth. During said period and since said separation practically until the time of the trial of this action defendant received from said Booth many and large sums of money. While plaintiff and defendant were living together, and after promises by defendant that she would cease all relations with said Booth, she continued to receive moneys from him and to correspond with him, and to conspire with him against her husband. By the use of moneys received from said Booth, defendant prosecuted her action in the State of Nevada, employed detectives and took other means against her husband for procuring a divorce from him and to secure for herself the custody of said children.

"In the month of March, 1926, and while plaintiff and defendant were residing together in the city of Los Angeles, defendant sustained an adulterous relation with a man other than said Booth.

"During the past two years, with wanton indifference to the welfare of said children, defendant stated to a number of people that one of her children was not the child of plaintiff but was the child of said Booth. Said statement was untrue. Both of said children are the natural children of plaintiff and defendant."

The defendant challenges the sufficiency of the facts to justify the foregoing findings of the trial court. The facts concerning the character of the defendant, showing the manner, purpose and intent of going to Reno, and there instituting an action for divorce, are so inextricably interwoven that we will consider both questions at the same time.

The testimony shows indubitably that the matrimonial domicile of the plaintiff and the defendant was at all times in the county of Los Angeles. On November 15, 1926, the defendant began an action for divorce against the plaintiff in the county of Los Angeles. To give the county of Los Angeles jurisdiction it was necessary to allege her domicile as being in that county. On the twenty-ninth day of March, 1927, the defendant made application for a passport to England and Austria, in which she declared that she was domiciled in the United States and that her permanent residence was at 302 South St. Andrew's Place, in the city and county of Los Angeles, state of California. The record shows the continued residence of the defendant in Los Angeles until she left for Reno.

The defendant testified that before going to Reno she and one James Scripps Booth had a conversation about intermarrying as soon as each of them could be divorced, Booth from his wife and the defendant from her husband. James Scripps Booth was one of the men with whom the defendant was having illicit relations. The defendant went to Reno in June, 1927. She had no acquaintance with anyone living there.

After the defendant had gone to Reno, arrangements were made by a Los Angeles attorney named Pearce, for counsel at Reno, and Pearce followed the defendant to Reno in about a week after the defendant had gone there. The expenses of Pearce's trip to Reno were paid by James Scripps Booth. The defendant's residence in Reno was interrupted by visits to Los Angeles, San Francisco, and New York. The defendant and Booth, while having discussed marriage, never talked about living in Reno. Mr. Booth himself was a resident of Pasadena, in the county of Los Angeles. Upon going to Reno the defendant went first to the Golden Hotel and then to the Riverside Hotel. The defendant resided at the Riverside Hotel until October, 1928. In September or October she took a double bedroom, living with a Mrs. Nicholson and a Mrs Sargent, Mrs. Sargent being in Reno for the purpose of obtaining a divorce. The associations of the defendant in Reno were with persons who were there for the purpose of obtaining divorce decrees. The defendant testified that before going to Reno she might have heard that Reno was a nice place to get a divorce. She

knew that a final decree, and not an interlocutory·decree could be had there. After going to Reno she made a trip to New York, and was gone from the 1st of January, 1928, until a short time before the hearing of her divorce case. On February 28, 1928, a divorce decree purporting to divorce the defendant from the plaintiff was entered in the District Court of the Second Judicial District of the County of Washoe, State of Nevada. Summons in this action was served by publication. The defendant never appeared, and the children, the issue of the marriage, were in the state of California, as hereinbefore stated. There is also testimony in the record to the effect that the defendant stated she intended to return to the state of California.

At the time the defendant went to Reno she took with her only her clothing. She left in Los Angeles the contents of one safety deposit box. At Reno she occupied her time playing golf; did not engage in any employment for compensation. The defendant did testify that she was going to take a course at a business college, and started in December, quitting before she went to New York in January, but did not know with certainty the name of the school she attended, when she started, how long she studied, where the school was located, or how much she had paid as tuition. When the defendant was in Reno she depended for support on moneys received from Mr. Booth, and some from her parents.

The defendant first met James Scripps Booth in 1920, and became very fond of him. Mr. and Mrs. Booth had three children of their own, of which fact the defendant had knowledge. Subsequently the defendant and Booth had illicit relations. The defendant did not remember when the illicit relations began. The defendant claimed that one of the children hereinbefore mentioned was the child of Booth and herself. The defendant had no recollection of the number of times she had illicit relations with Booth. She said it began at Booth's studio in Pasadena; that her adulterous relations with Booth ceased in 1926. Amt about that time she testified that she met Booth at Hermosa Beach and went with him to Santa Ana and stayed overnight; that she took a trip east in January, 1928, to see Booth; that she was in New York approximately six weeks; although she says Booth was there only two days. Mr. Booth was in Los Angeles in the early part of the year when the defendant went to Reno. That Booth went east and returned to California

and conferred with her and her attorneys. The agreement between herself and Booth to marry if she got a divorce was admitted as heretofore stated.

The testimony shows that Booth and the defendant were found in a bedroom at Santa Ana with the defendant undressed. During all of the times mentioned herein Booth was paying defendant large sums of money. The record shows that Booth paid counsel fees for the defendant in the sum of at least $7,000. The attorneys in Reno who acted for the defendant were paid by Booth. At times the defendant received money from Booth in the form of greenbacks; just how much she received she did not know. We quote a portion of the testimony of the defendant as to the receipt of money: "Q. In how many different sums did it come? A. I have no idea. Q. From whom did it come? A. Mr. Booth. Q. Can you approximate the total amount that you received from him? A. No. Q. When did you first begin to receive money from Mr. Booth? A. I don't remember. Q. Was it before or after you went to Reno? A. Before. Q. How much then? A. I don't remember. Q. You have no idea? A. No. Q. What did you do with the money? A. I spent it."

The testimony discloses that the defendant was receiving money from Mr. Booth for a considerable time before going to Reno. The testimony further shows that the defendant had meretricious relations with a young man by the name of Manning. The adulterous relations of the defendant with Booth, her going to Reno, the employment of counsel, the payment of counsel fees, and the payment of expenses by Booth were all admitted by the defendant upon the witness-stand. It does not depend upon the testimony of any other person, save and except that counsel for the defendant admitted the payment by Booth of the sum of $7,000.

The foregoing summary we think sufficiently shows that we need not set forth herein any further portions of the transcript, and that it is sufficient to say that the entire record presents simply a picture of a man and woman infatuated with each other, maintaining illicit relations, and one of them going to Nevada to obtain a speedy decree of divorce and the other furnishing the money. Upon the face of such a record we do not well see how it can be reasonably contended that the defendant went to the state of

Nevada for the purpose of becoming a *bona fide* resident thereof, or that a married woman having such loose ideas of morality, and perfectly willing to give her person to two other men can be said to be a fit and proper person to control, shape or guide the destinies of minor children. True, the defendant testified that she went to Reno for the purpose of making Nevada her home. In view of the circumstances, however, the trial court was under no obligations to accept such a statement. The defendant's statement of her intent to make Nevada her home is well answered by a note appended to the case of *Rex* v. *Board of Assessors,* found in Annotated Cases 1917B, page 728, as follows: "Evidence of expressed intent, however, has no controlling weight if such an intent is inconsistent with the acts and general conduct of the person. Acts showing intent will, in such a case, outweigh expressions of intent." (Citing a number of cases.) The acts of the defendant do not harmonize with any intent to make Reno or any place in Nevada her permanent residence. She went there wholly unacquainted; she had no means of support, save and except furnished as herein stated. True, she said she began to attend a business college, but her own answers as to when she began to attend, when she ceased, the name of the college, and the cost of tuition render the whole story incredible.

The evidence, as we have epitomized it, and the findings of the trial court reciting additional facts, establish clearly that had the court found that the defendant had gone to Nevada with the *bona fide* intention of making that state her home, such findings could not have been sustained.

The defendant further relies upon the doctrine of full faith and credit being given to the judgments and decrees made and entered in a sister state when called in question in a local court. This is subject to the exception, however, that the court pronouncing the decree of divorce must have jurisdiction of both parties, and the full faith and credit clause of the federal Constitution does not apply where it is evident that the court pronouncing the decree has no jurisdiction over the defendant against whom the action is being prosecuted. Nor does such a decree have any force or effect over the children of the marriage where the children were not within the jurisdiction of the court

pronouncing the decree. Nor does the law recognize as valid a decree obtained by anyone who goes from the state of his residence to a foreign state for the sole purpose of obtaining a decree of divorce. This rule is well stated in 19 C. J. 370, as follows: "It is a well established proposition that where one spouse goes to a state other than that of the matrimonial domicile and there obtains a divorce under a residence simulated for that purpose and not in good faith, the judgment is not binding upon the courts of other states. It is within the power of the state to forbid the enforcement of such a decree. The rule is especially true where the cause of divorce is not one recognized by the laws of the state of his domicile, and the full faith and credit clause of the federal Constitution is not violated by the refusal of a state court to give effect to a foreign decree of divorce obtained by one who had temporarily left the state for the purpose of obtaining the divorce for a cause which had occurred in the state while the parties resided there and which was not there a ground for divorce." At the same time the law recognizes that where one in good faith changes his domicile, the fact that a divorce may be more readily obtained in the place to which such a person goes is no objection to its validity.

▮ There is also a clear distinction between mere residence and domicile. In the case of the former no jurisdiction would be acquired by substituted service where the defendant did not appear. In the latter case substituted service is now recognized as sufficient to give the trial court jurisdiction. Thus, the fact that the defendant in this case was a resident, or was a person abiding in the state of Nevada, for a period of at least three months as provided by the statutes of that state, did not give the court jurisdiction over the plaintiff in this action by substituted service where he did not appear, the domicile of the defendant, the plaintiff in that action, being as found by the trial court in this action, all the while in the state of California. The full faith and credit clause of the federal Constitution is given effect in the cases of substituted service only where the action is begun in a state where the plaintiff has a *bona fide* domicile and is not merely in the state for the purpose of securing a decree of divorce. This is clearly stated in the text found in 19 C. J., page 373:

"The Supreme Court of the United States has now definitely decided that the courts of the state of the last matrimonial domicile may grant a decree of divorce without personal service of process upon, or the appearance of, defendant therein, where service of process is made in accordance with the laws of that state, and that such a decree is entitled to full faith and credit in the courts of all of the states of the Union." A *bona fide* residence, however, is essential to jurisdiction, and a valid divorce decree cannot be founded upon a simulated domicile or a residence undertaken for the purpose of securing such a decree. (*Bennett* v. *Bennett,* 28 Cal. 599; *Bruguiere* v. *Bruguiere,* 172 Cal. 199 [155 Pac. 988, Ann. Cas. 1917E, 122]; *Kelsey* v. *Miller,* 203 Cal. 61 [263 Pac. 200]; *Flynn* v. *Flynn,* 171 Cal. 746 [154 Pac. 837]; *Bell* v. *Bell,* 181 U. S. 175 [21 Sup. Ct. Rep. 551, 45 L. Ed. 804]; *Haddock* v. *Haddock,* 201 U. S. 562 [26 Sup. Ct. Rep. 525, 50 L. Ed. 867, 5 Ann. Cas. 1].) Other cases might be cited, but the case of *Haddock* v. *Haddock, supra,* thoroughly considers every question involved in this action, and supports the rules which we have hereinbefore stated.

█ So far as the Nevada decree assumed to award the custody of the minor children of the plaintiff and defendant to the defendant is concerned, we need only refer to the case of *Anthony* v. *Tarpley,* 45 Cal. App. 72 [187 Pac. 779], where the court held, speaking through Mr. Presiding Justice Waste, as follows: "No judgment can be predicated upon an order of the court of another state, contained in a decree of divorce in relation to the custody of a child. Such order is not a finality in any sense of the word. It does not preclude the court granting the order, as long as the minor is within its jurisdiction, from varying or modifying its decree in that respect, from time to time, as circumstances change. It was, therefore, not in any sense a final judgment." This applies directly where the court pronouncing the decree has jurisdiction of the children. In the case at bar the facts show that the Nevada court had no jurisdiction to award the custody of the minors to either of the parents.

█ That judgments affecting custody of children, even where the court has jurisdiction, are not final, we may also refer to the case of *In re Culp,* 2 Cal. App. 70 [83 Pac. 89], where the law is fully set forth in a concurring opinion

written by Mr. Justice McLaughlin, showing that such judgments are always subordinate to the welfare of the child, and any court having jurisdiction of the child may make other or further orders.

One question only remains for our consideration: The appeal by the plaintiff in this action from that portion of the judgment which permits the defendant to have the custody of the minor children for the period of four weeks during the summer vacation. In view of what we have stated relative to the power of the trial court to make further or other orders concerning the custody of the minor children, and that the welfare of the minor children is the paramount consideration at all times, we are not disposed, under the facts disclosed by the record in this case, as hereinbefore stated, to reverse that portion of the decree, even though we may be of the opinion that the testimony contained in the record shows that such limited custody of the children should not have been granted.

An examination of the transcript shows that the decree in this cause was signed by the trial court on the third day of July, 1928; docketed and entered on July 6, 1928; that the transcript on appeal was settled in accordance with the stipulation of counsel dated the third day of June, 1930, almost two years after the entry of the interlocutory decree; that almost two and one-half years have elapsed since the settlement of the transcript on appeal. From the foregoing it appears that approximately four and one-half years have elapsed since the entry of the interlocutory decree. The children, of course, are that much older; the conditions may not be at all similar now to what they were on the date of the entry of the decree; if they have changed, or if circumstances as they now exist, require a change of the decree relative to the custody of the minor children, the trial court, upon application therefor, has full power to make such change as will best serve the welfare of the children.

Being of the opinion that the Nevada court had no jurisdiction to enter any decree dissolving the matrimonial relations existing between the plaintiff and the defendant, and also being of the opinion that the facts disclosed in this case justified the trial court in awarding the plaintiff a decree of divorce and the custody of the minor children, it fol-

lows that the judgment and decree of the trial court should be affirmed. And it is so ordered as to both appeals.

Pullen, P. J., and Thompson (R. L.), J., concurred.